# IN THE COURT OF APPEALS OF IOWA

No. 21-1776
Filed September 13, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MUSTAFA F. MUHAMMAD,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Marshall County, Bethany Currie,

Judge.

        Mustafa Muhammad appeals from his conviction for first-degree murder.

**AFFIRMED.**

        Katherine N. Flickinger of Hastings & Gartin Law Group, LLP, Ames, for

appellant.

        Brenna Bird, Attorney General, and Bridget A. Chambers, Assistant

Attorney General, for appellee.

        Considered by Bower, C.J., and Ahlers and Chicchelly, JJ.

**BOWER, Chief Judge.**

Mustafa Muhammad shot and killed Blake Thomas and was charged with first-degree murder, reckless use of a firearm, and prohibited person in possession of a firearm. Muhammad pleaded guilty to the prohibited-person charge and proceeded to trial on the other charges, asserting he acted in self-defense. The jury convicted him as charged. On appeal, Muhammad contends there is insufficient evidence of deliberation, premeditation, and lack of justification to sustain the first-degree murder conviction. Because there is substantial evidence from which the jury could reasonably find Muhammad acted deliberately, with premeditation, and without justification for the killing, we affirm.

**I. Background Facts.**

On March 14, 2020, Muhammad and his partner, Kelly Coleman, went to a bar in Marshalltown. Sarah Desautels was also at the bar and invited people to her house after the bar closed at 2:00 a.m. on March 15. Muhammad and Coleman joined about twenty to thirty others at the afterhours party. As the morning wore on, a dispute occurred upstairs with yelling; that situation deescalated. Another dispute later occurred at the bottom of the stairs, and Desautels told everybody to take it outside. Several people went outside, including Muhammad; Blake Thomas and his brother, Robert Thomas;[1] Jack Edwards; Jared Smith; Sheylynn Davis; Valerie Griego; Shonnelle "Pooh" Holmes; his brother "Q"; and their cousin Ervin Dewalt. Muhammad told Special Agent Scott Reger at a later interview that Blake and Robert both announced they had guns, he heard a gun being cleared, and

---

[1] Several people share the same last name of Thomas, after an initial introduction we will refer to them by their first names only.

then saw Blake reach toward his hip. Muhammad pulled out a handgun and fired. Muhammad then ran back inside Desautels's house, gathered Coleman, and the two went to her car. Someone hit Muhammad, who fell to the ground. That person ran off, and Coleman drove herself and Muhammad away.

Blake was lying on the ground near an alley across the street from the party house. People attempted to help Blake while they waited for police and an ambulance to arrive. Officers arrived about 3:30 a.m., including Lieutenant Kiel Stevenson, who is also a certified emergency medical technician. He assessed Blake's wounds and provided aid, along with other officers. Blake was unconscious but alive.

Receiving information a possible suspect was dating Coleman, Lieutenant Stevenson instructed Officer Nicholas Svoboda to go to Coleman's address, keep watch on the residence, and report if anyone came or left.

Meanwhile, Coleman and Muhammad drove to their house, and Muhammad told Coleman, "The dude should have stayed away from him and stayed out of his face." Muhammad told Coleman to call Pooh. Muhammad showered and changed his clothes while Coleman made the call to Pooh and attempted to call their neighbor, "Tex." Coleman then put Muhammad's clothes in the washing machine and started the wash cycle. Then Pooh, Q, and Ervin came to the house. Coleman heard Muhammad say to the visitors "he heard the gun cock and someone shot in the air. Dude cocked the gun." When the visitors left, Coleman and Muhammad left to go to a casino. They stopped for cigarettes at a convenience store.

At 4:23 a.m., Officer Svoboda reported that a dark-colored SUV had just left Coleman's address. Lieutenant Stevenson located the SUV at a convenience store and followed it, stopping it just before 4:30 a.m. The driver was Coleman, and the only passenger was Muhammad. They were both taken into custody.

After leaving Coleman's address, Officer Svoboda went to the emergency room and was in the room with Blake when he was pronounced dead. The officer spoke with Desautels there. She approached and told him she thought she had been shot—she showed him a graze wound on her right hip.

Agent Reger arrived at the police station and attempted to interview Muhammad at about 6:30 a.m. but was unable to arouse him from sleep. Agent Reger returned at about 8:30 a.m., and Muhammad agreed to speak with him after being read his *Miranda* rights. Over the next several hours, Muhammad's account of the events leading up to the shooting evolved. First, Muhammad told Agent Reger he went to the party with Coleman and knew no one else there. He said he intervened to calm a situation upstairs after someone had walked into a room and interrupted a couple inside. He said another dispute started up at the base of the stairs between two groups of people. Muhammad said they took the dispute outside where shots were fired—Muhammad said he was standing in the doorway and, as the group was leaving the house, one of the "white or Mexican guys" left the house and Muhammad heard the "clink clink" of a gun being made ready to shoot. Muhammad said he went to get Coleman and left. As he was leaving, someone came up from behind him and hit him in the head. Muhammad later told Agent Reger he did go outside where a drunk Blake was talking about this is my town and pulled a gun from his back and then came toward Muhammed and "got

up on him." Then Robert said he had a gun too. Muhammed told Agent Reger he knew "it's me or him." He did not say how many shots he fired. He left after getting Coleman. Muhammad said someone came up to him by the car and hit him; when Muhammad looked at him the person left. Muhammad also told Agent Reger he threw the gun and his clothing out of the car as he and Coleman headed to their house.

Investigators at the scene collected twelve spent ten-millimeter shell casings. An autopsy revealed Blake had been struck six times and died of multiple gunshot wounds. When Muhammad's home was searched, officers found an empty holster and collected Muhammad's wet laundry. They also found a Glock 20 ten-millimeter handgun inside the cover of Tex's grill. Muhammad's palm print was on the gun, and forensic analysis determined the casings found at the scene of the killing were fired from that weapon.

Muhammad was charged with first-degree murder. He asserted a justification defense.

At trial, several of the attendees of the house party testified—those who observed the shooting saw only Muhammad with a gun.

Kenny Aschan testified Muhammad, Robert, and Blake were involved in some yelling upstairs at the afterhours party. The yelling continued until it went out the front door, into the street, then "it ended up in somebody's yard." He stated it was loud and he couldn't tell what was being said, but "[n]obody was getting touched." Aschan said he was "standing right beside Blake" at the side of the street; Muhammad was in the middle of the street facing Blake.

Q. Did you observe anybody with any sort of weapons?
A. Uh-huh. I saw Muhammad reach in his—right here (indicating) and pull it out.

Q. And you kind of gestured toward I think your hip; is that correct? A. Yeah, the waistband.

Q. The waistband of his pants? A. Yeah.

Q. Okay. Did you observe anybody else with a weapon?
A. No. Nobody else had a weapon.

Q. Did you hear any sounds that would make you think anybody else had a weapon? . . . A. No.

Q. Did you observe anybody throw a punch or try to shove Mr. Muhammad? A. No, there was no fighting. Ain't nobody do nothing. Nothing physical, nothing.

Q. Did Mr. Muhammad put his hands on anybody? . . . A. No.

Q. Okay. What happened after Mr. Muhammad pulled the gun out of his waistband? A. Well, he shot a couple shots.

Q. Where was he pointing the gun? A. Towards the crowd where everybody was standing by Blake.

Aschan testified he was later presented with a photo array and identified Muhammad as the shooter. He denied either Blake or Robert had a reputation for violence.

Sheylynn Davis testified she and Valerie Griego went to the Center Street bar about midnight on March 14 and, when the bar closed, they and Davis's boyfriend Delaurentiss Thomas[2] ended up going to an afterparty at Ariel Perkins's and Desautels's house. People were drinking and socializing. About twenty minutes after arriving at the party, her boyfriend Delaurentiss was apologizing to Muhammad, who she knew as "Mike," "and he was not trying to hear it. He was cussing at him. He don't really give an F about what he was talking about, to get out of his face." About two minutes later, Davis saw Muhammad and Coleman together and "[h]e was basically telling her like be ready to go and watch my back and be on your P's and Q's."

---

[2] No relation to Robert and Blake.

Davis continued:

> I was at the top of the stairs and I seen a group of people at the bottom of the stairs kind of arguing with each other. I had seen Blake and Kenny and my boyfriend's brother and Mustafa all at the bottom and I heard Sarah yelling for everyone to get out of her house.
>
> Q. Let me stop you for a second. You said you saw Blake and Kenny and Mustafa and your boyfriend's brother in the group that was arguing? A. Yeah.
>
> Q. What's the name of your boyfriend's brother? A. Cedano Thomas.
>
> Q. And did you notice anyone else in the group arguing besides those people? A. I think I seen Robert at the end—yeah, I seen Robert at the bottom of the stairs also, and there was a few other people that I didn't really catch, but there was a big group of people down there.
>
> Q. And then Sarah wanted them to go outside? A. Yeah.

Davis did not know what the arguing was about. "Blake walked away and Blake went to walk outside and then Cedano and I think Robert followed after him and then shortly after Mustafa followed after them as well." Davis said she ran down the stairs and followed them outside because she thought Cedano "was fighting with somebody because that's his character."

Davis explained:

> I went down the stairs and Blake had walked across the street and then I heard Mustafa kind of yell at Blake and Blake had turned around and Mustafa was like what's up. Blake was like what, what's up, and then I put my hand on Mustafa's shoulder and I asked if he had seen [Cedano] and he like elbowed me off of him and reached in his jacket and then pointed up and then just started to shoot at Blake.

Davis said Blake and Muhammad were "[n]o more than five feet" from each other; Blake was at the edge of the alley, and Muhammad was in the middle of the street. Davis was behind Muhammad's left shoulder about a foot away. She remembered Desautels, Smith, and Aschan being in the area and seeing Robert

run up to Blake after he was shot. She testified there was "plenty" of space around for Muhammad to move away or retreat from the area.

Davis ran to Blake. She saw that he was bleeding and lifted his shirt to try to cover his wound. She did not see a gun or other weapon on Blake even though she "absolutely" was in a position where she would been able to see any gun. Davis did not see where Muhammad went after he shot Blake nor what he did with the gun.

According to Edwards, while he was at the house party, there was an argument near the front door between Robert and another person. Edwards overheard "a little bickering back and forth. You don't know me. I'm not from here. You don't know me. This is my town, that type of stuff, at the door at the entryway of the house." People tried to stop the commotion, "but it did end up outside." He remembered Jared Smith came in the door and said "guys, don't be going outside, they have a gun there."

Edwards testified he did go outside and saw Blake walking in a circle "hooting and hollering. You don't know me. This is my town.'" Robert was trying to calm him. Edwards stated, "I didn't see a gun. I didn't hear a gun. There was no physical altercation. Just more of a who can talk the strongest." He stated the group ended up across the street between the sidewalk and the alleyway. Edwards testified Blake was standing in front of Muhammad "just letting him know who he was and not backing down." He said Blake was in the alleyway facing Muhammad and "they were getting kind of close to each other, that's when . . . Blake said who's ready to die tonight, kind of went like this (indicating [towards his waistband]) and that's when everything happened." Then Muhammad "took a half

step back and started firing a gun." Edwards said, "As soon as he pulled it out, it wasn't even aimed at anybody yet and it had already went off. I mean, as he was pulling it out of his waistband, it went off and then directly pointed it at Blake and started firing." Edwards testified Muhammad then ran back inside the house and then out the side door trying to get to his vehicle. Edwards caught up to Muhammad and punched him in the face. Muhammad fell to the ground and Edwards saw him reaching toward his waist, so he took off running because he did not know if Muhammad still had a gun. He saw Muhammad and Coleman drive away.

On cross-examination, Edwards acknowledged that "in other people's eyes" Robert had a reputation for being violent and quarrelsome. He disagreed Blake had that reputation. Edwards acknowledged there were people drinking and smoking pot at the party. The following exchange occurred:

> Q. It all happened pretty fast, didn't it? A. Yes, very fast.
> Q. I want to focus just on the briefest moments of what you saw there. What you saw was—well, what you heard was Blake saying who's ready to die tonight; correct? A. Correct.
> Q. And then you saw him grabbing at his waistband; correct? A. Correct.
> Q. And then you see the person you identified as my client, Mustafa, start to pull out a gun from his waistband; is that correct? A. Correct, as he's saying not me.
> Q. And that . . . gun went off as he was pulling it out; correct? A. Correct.
> Q. As he was saying not me, he was actually trying to deescalate the situation at one point, wasn't he? A. At one point.
> Q. And so it just went off into the ground do you think? A. Yes.

Smith testified that when people went outside "there [were] people on the porch, in the front yard, in the street, in the alley across the street." Smith stated he and Blake were by the alley "when [Muhammad] came out of nowhere and said

something about Chicago this, Chicago that" and Blake responded "this is Marshalltown, not Chicago." Then he saw Muhammad pull a handgun from his waist and "pull the trigger many times." Smith said he was standing next to Blake and, when Blake fell, Smith stepped back, checked himself to see if he had been shot, and called 911. When asked if people were crowded around Muhammad so he couldn't retreat, Smith responded, "No, no, they were spread out."

Coleman testified she told detectives when giving her statement that Pooh had a gun and that Blake or Robert had a gun. She testified she did not leave the house when everyone else went outside "[b]ecause I seen a gun and I'm not stupid." Coleman said she did not know if Muhammad had his gun that night. She testified she knew Blake and Robert to be quarrelsome and aggressive and to carry weapons. On cross-examination, Coleman agreed she had told an officer she looked outside and saw Blake and Robert standing in the middle of the street arguing. She also agreed Muhammad "said dude should have stayed away from him or not got in his face." On redirect, Coleman testified Muhammad "was calm" and he "didn't seem" angry or scared when he came to get her to leave.

Griego testified she had been at the bar when Desautels invited people to the afterhours party. She knew Muhammad as Coleman's boyfriend, "Mike." Griego was not aware of any ongoing disputes in the house until "[a] guy had walked in and said there was beefing outside" and Griego went outside to find her cousin, Davis. "They were all standing in the street. [Muhammad]'s back was towards me. I could see Blake [across from Muhammad], my cousin [Davis] was standing off next to [Muhammad]. I saw [Smith] standing over there and then I saw [Desautels] kind of standing back a little bit too." She stated she didn't see

much because "I walked outside and [Muhammad] kind of pulled out a gun and just started shooting." Griego did not see Blake or Robert with weapons and saw no altercation. She stated she did see Davis reach toward Muhammad's "shoulder area, but, like I said, he was pulling up a gun and started shooting." On cross-examination, Griego testified she "never witnessed" Blake being violent, quarrelsome, and aggressive—"You hear about things, but you never know how much you hear is actually true." She also stated she had never seen Blake with a weapon.

Agent Reger testified about Muhammad's differing accounts:

He was describing a group of black males, one particular one that had long dreads and another guy, he characterized him as a white male or Hispanic, couldn't tell, that they were arguing together on two different occasions inside the house.

An initial argument that settled down, then later on became another argument inside the doorway inside the house. And then the black males went outside. The white or Mexican males, as he described them, followed them there and then he could hear a shot and then another shot and then he turned around to look for Kelly his girlfriend inside the house, found her and then they left the scene.

. . . .

He's describing that he is not involved in the shooting. He's watching it play out in front of him. That was his initial story.

Q. And so were you able to figure out who he was referring to when he referred to the black man with dreads and then the guy that he talked about as perhaps being white or perhaps being Hispanic?
A. I never found out who the black male was that he was referring to, but my understanding later on was that the two—or the white male or white Mexican was Robert or Blake Thomas.

Agent Reger said Muhammad and he went through the event several times, and Muhammad denied being the shooter seven or eight times. About an hour and a half later into the interview:

When he finally admitting [sic] to shooting Blake, he described again the altercation inside the house on those two occasions and then how the altercation had gone outside, but his—when he

admitted to shooting Blake, he described being outside down where he initially said he wasn't, and he described I believe it was—I believe he had Blake Thomas off to his left, kind of behind him. He had his brother Robert—the way he was describing it kind of off to the front, in front of him and he described hearing the clink clink or the racking of the gun, and then he described the person to his left—I believe— he didn't call him Blake, but I believe that was Blake, pulling a gun from his hip, and then at that point that's when he shot him.

. . . .

He's describing that the brother in front of him, Robert, had— he heard a clink clink and Mr. Muhammad saying who's got a gun or you're saying you got a gun or something to that effect, and then hearing the other brother, Blake, behind him saying well, I got one too. That's what he's describing in there and then that's when he shot.

Q. And you're describing them as Robert and Blake, but Mr. Muhammad didn't know their names. You just surmised that's who he was referring to by everything that he said? A. Correct. At that point, I wasn't sure who he was talking about either, but later on discovering who was who.

Agent Reger stated Muhammad was not able to describe the guns he said Blake and Robert had other than "possibly one being black." Muhammad told Agent Reger he was hit by someone as he was trying to get into the car to leave. Agent Reger testified Muhammad had "some abrasions to his right eye" but did not state anyone had struck him before the shooting and had no other injuries.

On cross-examination, the defense asked Agent Reger to demonstrate the process of racking Muhammad's Glock 20, and the agent stated the sound made when he did so was "consistent" with the sound of his own state-issued Glock handgun. Agent Reger acknowledged that if he heard that sound at an afterhours party while a dispute between groups was ongoing it "would catch [his] attention" and "would raise [his] awareness" a gun was present. When asked what would go through his mind if he also heard someone say "who wants to die tonight," the agent said, "I need to get police here right away" and "potential[ly]" protect himself.

Several police officers testified about their roles at the scene and in the investigation. Some—but not all—testified one or both Thomas brothers had reputations for being violent, quarrelsome, and aggressive, and for carrying weapons.

The jury found Muhammad guilty of first-degree murder. He now appeals, claiming there is insufficient evidence of premeditation, deliberation, and lack of justification to sustain the conviction.

## II. Scope and Standard of Review.

> We review claims a verdict is not supported by substantial evidence for correction of errors at law. "Substantial evidence is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." "In determining whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'"

*State v. Davis*, 988 N.W.2d 458, 463–64 (Iowa Ct. App. 2022) (internal citations omitted). "Evidence is not insubstantial merely because we may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." *State v. Lacey*, 968 N.W.2d 792, 800–01 (Iowa 2021) (citations omitted).

## III. Discussion.

The jury was instructed that to convict Muhammad for first-degree murder, the State had to prove beyond a reasonable doubt all of the following:

> 1. On or about March 15, 2020, Mr. Muhammad shot Blake Thomas.
> 2. Blake Thomas died as a result of being shot.
> 3. Mr. Muhammad acted with malice aforethought.
> 4. Mr. Muhammad acted willfully, deliberately, premeditatedly and with a specific intent to kill Blake Thomas.

5. Mr. Muhammad was not justified.

Muhammad claims there is insufficient evidence of deliberation and premeditation (element four) and that the shooting was not justified (element five). We address each element in turn.

*A. Deliberately and Premeditatedly.* "[A]n actor will ordinarily be viewed as intending the natural and probable consequences that usually follow from his or her voluntary act." *State v. Taylor*, 689 N.W.2d 116, 132 (Iowa 2004). As defined by the jury instructions, which were not objected to at trial,

- To deliberate" is to weigh in one's mind, to consider, to contemplate, or to reflect.

- "Premeditate" is to think or ponder upon a matter before acting.

- Deliberation and premeditation need not exist for any particular length of time before the act.

- If a person has the opportunity to deliberate and uses a dangerous weapon against another resulting in death, you may, but are not required to, infer that the weapon was used with malice, premeditation, and specific intent to kill.

Because there is no question the firearm was a dangerous weapon, if the jury reasonably found Muhammad had an "opportunity to deliberate," that is "to weigh in one's mind, to consider, to contemplate, or to reflect," the jury could infer he used the firearm deliberately and with premeditation to kill Blake. *See State v. Frazer*, 267 N.W.2d 34, 39 (Iowa 1978) ("The use of a deadly weapon accompanied by an opportunity to deliberate, even for a short time, is evidence of malice, deliberation, and premeditation."); *accord State v. Hofer*, 28 N.W.2d 475, 483 (Iowa 1947) ("We have said several times it is sufficient if there

was deliberation and premeditation immediately before the fatal injury was inflicted though it may have existed but for a mo[m]ent or an instant.").

The State can prove deliberation and premeditation by three categories of circumstantial evidence: (1) planning, (2) motive, or (3) the nature of the killing. *State v. Helm*, 504 N.W.2d 142, 146 (Iowa Ct. App. 1993).

Viewing the evidence in the light most favorable to upholding the verdict, there is substantial evidence to support a finding Muhammad had an opportunity to deliberate before he used his firearm. Witnesses testified Muhammad and Blake were exchanging words or insults. There was no physical contact. There was testimony Muhammad stepped back and pulled out a firearm and fired several shots toward Blake. He later told Coleman, "dude should have stayed away from him or not got in his face." While witnesses described the events as happening quickly, Muhammad had the opportunity to leave the confrontation as he had walked away from other conflicts inside the house. But this time, he chose instead to pull out a loaded handgun and fire. The Glock 20 Muhammad used was a semi-automatic weapon with a magazine that held fifteen cartridges. Twelve cartridges were found at the scene, and all twelve were fired by Muhammad's weapon. Muhammad had to pull the trigger for each shot. The jury could have determined that Muhammad pondered or thought about his conduct before each trigger pull and thus acted with premeditation. *See State v. Thomas,* No. 19-0379, 2020 WL 5651563, at *4 (Iowa Ct. App. Sept. 23, 2020) (finding the jury could have determined that Thomas pondered before pulling the trigger each of his three shots and, therefore, that he acted with premeditation); *see also State v. Jenkins*, No. 21-1718, 2023 WL 4759448, at *6 (Iowa Ct. App. July 26, 2023) (collecting

cases on the permissible inference of deliberation and premeditation where killing involved the firing of multiple rounds or repeated infliction of injury).

*B. Without Justification.* We again begin with the instructions guiding the jury's decision.

> A person acts with justification in using reasonable force if he reasonably believes the force is necessary to defend himself or another from any imminent use of unlawful force.
> If the State has proved any one of the following elements, Mr. Muhammad was not acting with justification:
> 1. Mr. Muhammad started or continued the incident which resulted in death.
> 2. An alternative course of action was available to Mr. Muhammad.
> 3. Mr. Muhammad did not believe that he was in imminent danger of death or injury and the use of force was not necessary to save him.
> 4. Mr. Muhammad did not have reasonable grounds for the belief.
> 5. The force used by Mr. Muhammad was unreasonable.
>
> With respect to element 2 . . . , if Mr. Muhammad is confronted with the use of unlawful force against him, he is required to avoid the confrontation by seeking an alternative course of action before he is justified in repelling the force used against him. However, there are exceptions.
> If the alternative course of action involved a risk to the life or safety of Mr. Muhammad, and he reasonably believed that, then he was not required to take or use the alternative course of action to avoid the confrontation, and he could repel the force with reasonable force including deadly force.
>
> With respect to element 3 . . . , Mr. Muhammad claims danger existed. You are to consider the danger or apparent danger from the viewpoint of a reasonable person under the circumstances which existed at that time.
> It is not necessary that there was actual danger, but Mr. Muhammad must have acted in an honest and sincere belief that the danger actually existed. Apparent danger with knowledge that no real danger existed is no excuse for using force.
>
> With respect to element 4 . . . , Mr. Muhammad was not required to act with perfect judgment. However, he was required to

act with the care and caution a reasonable person would have used under the circumstances which existed at that time.

　　If in the mind of Mr. Muhammad the danger was actual, real, imminent or unavoidable, even though it did not exist, that is sufficient if a reasonable person would have seen it in the same light.

On appeal, Muhammad focuses on the danger he believed he was facing at the time of the shooting, as he relayed to Agent Reger. Blake was asking "who's ready to die tonight" while reaching toward his waistband and Muhammad heard a gun being made ready to shoot.[3] However, there is no testimony by anyone that they saw another gun or heard a gun being racked. *See Jenkins*, 2023 WL 4759448, at *7 (finding substantial evidence Jenkins escalated the level of force beyond what was reasonably necessary). On our review, we are mindful "[a] jury is free to believe or disbelieve any testimony as it chooses and to give as much weight to the evidence as, in its judgment, such evidence should receive." *State v. Liggins*, 557 N.W.2d 263, 269 (Iowa 1996); *accord State v. Mathis*, 971 N.W.2d 514, 519 (Iowa 2022) (noting it is for the jury "to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, [and] to weigh the evidence," not the appellate court). From the evidence presented, the jury could reasonably conclude Muhammad was not justified in shooting Blake. We affirm the conviction.

**AFFIRMED.**

---

[3] Counsel also states, "The Thomas brothers were known to go armed and known to be quarrelsome." But there is nothing in this record that Muhammad knew them or their reputations. So, even if true, it has no bearing on whether Muhammad had "an honest and sincere belief that the danger actually existed."